## Commonwealth *vs.* Shane M. Spencer.

Worcester. November 8, 2012. - May 2, 2013.

Present: Ireland, C.J., Spina, Cordy, Botsford, Gants, Duffly, & Lenk, JJ.

*Practice, Criminal,* Motion in limine, Admissions and confessions. *Evidence,* Admissions and confessions, Relevancy and materiality, Consciousness of guilt.

A Superior Court judge properly considered a criminal defendant's motions in limine seeking the exclusion of certain evidence, brought after other judges had denied the defendant's prior motions to suppress the evidence on constitutional grounds, where the motions in limine focused on issues of hearsay, probative value, and prejudice, issues distinct from whether the defendant's statements were made knowingly, intelligently, and voluntarily. [41-43]

The record of a criminal trial disclosed no basis on which to conclude that the Commonwealth had been precluded from arguing the probative value of certain evidence contested in the defendant's motions in limine [43]; further, there no merit to the Commonwealth's contention that the excluded evidence comprised the majority of its case [43-45].

In reviewing the conclusions of law of a Superior Court judge hearing motions in limine, this court relied on the analysis in the judge's comprehensive written memoranda of decision and declined to consider statements made by the judge during the motion hearings. [45-46]

A Superior Court judge hearing a criminal defendant's motions in limine to exclude the defendant's recorded statements to police, as well as recorded telephone calls that the defendant made from a house of correction, properly considered the evidence as extrajudicial statements made by a party opponent [46-47]; further, the judge did not err in excluding the defendant's recorded statements, where a significant portion consisted of inadmissible police accusations and comments or the hearsay accusatory statements of third parties [47-49] and the defendant's unequivocal denials of guilt [50-51], and where the statements were not necessary to establish consciousness of guilt [50]; finally, the judge did not commit an abuse of discretion in determining that the evidence of the defendant's telephone calls was more prejudicial than probative [51-54].

Indictments found and returned in the Superior Court Department on November 13, 2006.

Motions in limine to exclude statements of the defendant and telephone recordings were heard by *David Ricciardone*, J.

An application for leave to file an interlocutory appeal was allowed by *Spina*, J., in the Supreme Judicial Court for the county of Suffolk, and the appeal was reported by him.

*Stephen J. Carley*, Assistant District Attorney, for the Commonwealth.

*Charles K. Stephenson* (*Joan M. Fund* with him) for the defendant.

LENK, J. The defendant has been indicted for murder in the first degree, and for unlawful possession of a firearm and of ammunition as an armed career criminal. The Commonwealth seeks to introduce at his forthcoming trial the defendant's three recorded statements to police, made on July 29, July 30, and August 3, 2006, as well as eight recorded telephone calls that the defendant made from the Worcester County house of correction between August 2 and August 14, 2006. Shortly before trial was scheduled to begin, in conjunction with a number of other motions in limine, the trial judge considered the defendant's two motions in limine to exclude his statements to police and the recorded calls.

Following two hearings on those motions, the judge ordered that portions of the statements, largely from the interviews on July 29 and 30, 2006, be excluded, because they constituted unequivocal denials of police accusations, were not relevant to any matter in the case, or were substantially more prejudicial than probative. The judge concluded that the statements in six of the eight telephone calls were not relevant, were more prejudicial than probative, or should be introduced at trial, if at all, through the direct testimony of the person purportedly making the statement rather than through hearsay reports by others. The judge determined also that several of the telephone calls consisted primarily of statements by others that the defendant did not adopt. He allowed admission of two of the calls as, inferentially, efforts by the defendant to have someone dispose of the murder weapon.

The exclusion of portions of the defendant's statements to police, and of the six jailhouse telephone calls, is the subject of this appeal. Discerning no palpable error in the judge's rulings, we affirm.

1. *Background and prior proceedings.* We summarize the

evidence that the Commonwealth has stated it expects to intro-
duce at trial. Shortly after 4 A.M. on Saturday, July 29, 2006,
Luis Arocho-Ortiz was shot in the chest and killed while he was
standing on the sidewalk outside a friend's house on Southgate
Street in Worcester. A gray Toyota Corolla drove past slowly,
and a back seat passenger began shooting into the crowd of
people gathered there for a party, hitting Arocho-Ortiz. The
Commonwealth's theory is that the defendant was the passen-
ger, and that his intended victim was Francisco "Tito" Rivera
(Tito),[1] who lived in the house where the crowd was gathered.
The other occupants of the Corolla were the defendant's friend
Jonathan Monroy, who was driving; the defendant's friend
Francisco "Cisco" Rivas (Cisco); and Cisco's girl friend, Heidi
O'Brien. The Commonwealth intends to establish at trial that
the defendant had become convinced that Tito, and not the
defendant, was the father of the defendant's girl friend's child,
and that, in the weeks before the shooting, the defendant had
engaged in a series of increasingly violent confrontations with
Tito.

Police began looking for the defendant shortly after the shoot-
ing, when they tracked the Corolla to a house on Gates Street,
where they found Cisco, Monroy, and O'Brien.[2] The defendant
was arrested at approximately noon on July 29, when police
located him in a house near his mother's house on Mott Street.[3]
Police also were directed to a gun found by a downstairs neighbor
in a trash container in the backyard outside the defendant's
sister's house. At the police station, two cellular telephones were

[1]To avoid confusion, we refer to Francisco "Tito" Rivera and Francisco
"Cisco" Rivas by their nicknames. In addition, because she shares a last
name, we refer to the defendant's girl friend, Jenesca Rivera, by her first
name. Jenesca Rivera is not related to "Tito."

[2]Members of the crowd were able to describe the gray Toyota Corolla, but
not its occupants. Some of them recognized the vehicle as Jonathan Monroy's.
Monroy and Heidi O'Brien were each interviewed separately on two occa-
sions, and each denied any knowledge of the shooter. On August 7, Cisco told
police that the defendant was the shooter. Cisco, Monroy, and O'Brien were
also interviewed together that day; they stated that the defendant had pulled
out a gun that they did not know he had, and had begun shooting. Subsequently,
Monroy was charged as being an accessory after the fact to murder, in con-
nection with his purported disposal of the murder weapon.

[3]The defendant lived in his mother's house on Mott Street, with his mother,
Jenesca, and their son.

seized from the defendant; he was given Miranda warnings and agreed to speak with police. When the defendant asked why he had been arrested, officers responded that it was for an assault and battery by means of a dangerous weapon. Police told the defendant that they were investigating an incident on July 26, when, according to Tito, he had been standing near the intersection of Grand and Cheney Streets in Worcester. The defendant had appeared across the street, called out his name, and then pulled out a gun and fired four shots at him. Tito ducked behind a car, escaping injury, and heard a car leave the scene.

The interview on July 29 was videotaped and lasted approximately forty-five minutes. It focused initially on the alleged shooting on July 26. The interview then turned to the defendant's activities on the night of Friday, July 28, and the early morning of Saturday, July 29. The defendant stated that he had spent the evening with a number of friends and relatives, including his brother and sister, at a night club, before returning to continue "partying" with friends, relatives, and neighbors outside his mother's house. During that interview, the defendant said he was familiar with "Francisco Rivera" but did not know him well. He denied any argument with "Francisco Rivera," and denied any suspicion that Jenesca had been "cheating" on him with "Francisco" or with any other man.[4]

Police interviewed the defendant again at approximately 7:30 P.M. on the evening of Sunday, July 30, for about forty-five minutes. During this videotaped interview, detectives informed the defendant that they were also investigating a shooting on Southgate Street that had taken place on Friday night. The interview focused initially on the defendant's activities on the night of that shooting. The defendant recited a somewhat different account of his movement between clubs and his subsequent all-night "partying" with friends and relatives outside his mother's house, and of how well he knew Tito. When police suggested that they were being told by others the defendant had

[4]During this interview, police initially asked the defendant if he knew a "Francisco Rivera," to which the defendant replied that he did. Thereafter, most of the questions referenced "Francisco," and some used the name "Cisco." The full name "Francisco Rivera" was used a few times; the name "Tito" was not used at any point during this interview.

been involved in the drive-by shooting, the defendant denied ever having been on Southgate Street or knowing where Southgate Street was, and denied knowing anyone named "Francisco Rivera." He said anyone who claimed he had been involved with the shooting must be lying. When police asked him why he had said during the earlier interview that he knew a "Francisco Rivera," the defendant explained that he thought police were referring to his friend Francisco Rivas, known to him as "Cisco."[5] When shown a photograph of Francisco Rivera, the defendant identified the photograph as being the person he knew as "Tito,"[6] but denied knowing Tito's formal name,[7] denied any dispute with Tito, and denied suspecting Tito of involvement with Jenesca.

A few days after the defendant was taken to the Worcester County house of correction, he requested to speak with police. On August 3, Worcester police went to the house of correction to interview him. After being given Miranda warnings, and waiving his Miranda rights, the defendant made an audiorecorded statement in which he recited a similar, but varying, account of going to clubs and "partying" with friends and relatives on the night of July 28-29. Then, for the first time, the defendant informed police that Cisco, who was a member of the Vice Lords gang, had been planning to kill "Kelvin," a member of the South Side gang, who had just been released from jail.[8] Cisco had a "beef" with Kelvin over a girl they had both dated. The defendant said that Cisco told him, as Cisco was preparing to drive to Southgate Street

---

[5]Some of the defendant's responses during the July 29 interview, including his references to Cisco's girl friend, "Heidi" (O'Brien), to bringing Cisco marijuana to smoke, and to Cisco arranging to meet him at a club, indicate that he is discussing his friend Cisco, and not Tito.

[6]Police began this interview by questioning the defendant about "Francisco" or "Cisco"; the name "Tito" was used for the first time later in the interview, shortly before police asked the defendant to identify the photograph.

[7]While police were overtly skeptical about the defendant's assertions that he did not know Tito's full name, the defendant stated consistently that he knew many of his friends and acquaintances only by their first names and, indeed, described asking for someone's last name as "getting into people's business." Among these were "Heidi," a longtime friend as well as Cisco's girl friend; "Brianna," the defendant's other "girl"; and his sister's aunt, "Lisa." The defendant identified a number of individuals from police photographs and told police that he knew only their first names.

[8]Kelvin Arocho is the victim's brother.

with several others to "get in some trouble" with South Side and to "kill" Kelvin, that, if he could not find Kelvin, he would "get anybody . . . close" to Kelvin. Earlier in the evening, Cisco had shown the defendant a black Ruger handgun, which shot "little bullets," that Cisco had been carrying all day; this description matched the gun police located outside the defendant's sister's house.

Between August 2 and August 14, the defendant made eight recorded telephone calls from the Worcester County house of correction that the Commonwealth seeks to introduce in evidence. We set forth a synopsis of those conversations, adopting the numbering convention used by the parties.

Call 5R: The defendant telephones Jenesca and has her call Cisco. He then tells Jenesca to ask Cisco why Cisco is "telling everyone stupid shit" when he should be "holding me down." Cisco confirms that he will "hold [the defendant] down."

Call 10R: The defendant tells Jenesca that he needs her to do something for him and that he cannot "even say [it]" over the telephone. He tells her to take something green from the back hallway and give it to someone whose name is not discernible.

Call 13R: The defendant reads Jenesca the police report summarizing Tito's allegations to police about the assault on July 26. He notes that there is no ballistic evidence, and Jenesca says that the defendant will be fine because he knows he had nothing to do with that assault. The defendant suggests that he intends to post copies of the report in various restaurants and businesses around town so that people will know Tito is "a snitch." Jenesca supports the plan. Cisco then joins the conversation in a conference call; he says that he is holding the defendant down and that all kinds of rumors are circulating. The defendant says that there is "money on [his] head." Cisco says the defendant should not worry about it because the defendant knows he was at his baby's mother's house at the time of the shooting.

Call 14R: The defendant speaks with Cisco a few minutes later, again in a conference call with Jenesca. The defendant says that there is a $50,000 price on his head, but Cisco thereafter dominates the conversation, saying that police questioned him and he told them nothing, and then detailing the alibi he

gave police concerning his own whereabouts that night.[9] Cisco says he was talking with the victim's brother and others, who came to his house trying to figure out who was responsible for the shooting. Cisco says that police are acting as though Cisco is a suspect, that the defendant has "nothing" to worry about, that "it wasn't" the defendant, and that the defendant knows he was at his daughter's mother's house at the time of the shooting.

Call 15R: Jenesca asks the defendant why Cisco was saying that the defendant was at his daughter's mother's house on the night of the shooting (Jenesca is the mother of the defendant's son). The defendant says that he does not have a daughter and does not know why Cisco said that, but that he wants Jenesca to tell Cisco the defendant is "still here" for him.

Call 29R: Jenesca says she does not want to be with the defendant anymore, after talking to a woman named "Brianna." The defendant denies cheating on Jenesca with Brianna and says he wants nothing to do with Brianna. Jenesca suggests that she make a conference call to Brianna, but the defendant refuses. They argue, as Jenesca maintains that the defendant has been with Brianna for a month.

Call 58R: The defendant calls Jenesca, and an unidentified male joins the conversation. He says, "There's a party downstairs or not?" The defendant replies, "Yeah." The male says, "I'm talking about like breaking windows and all that other shit. You understand, right?" and the defendant responds, "Yeah." When the male asks, "It's that time, right?" the defendant replies, "I guess," but Jenesca then tells the defendant he does not know what the male is talking about.

Call 59R: The defendant calls Jenesca and she speaks with Cisco, who appears to be with her. The defendant tells Jenesca to tell Cisco that the defendant needs a new pair of sneakers, because he stepped in a cat litter box near the back stairs at his sister Melinda's house. He adds, "Or he can just . . . take the ones that got stepped in shit and . . . do whatever with them."

The defendant previously moved to suppress his statements and the recordings of the telephone calls on the grounds that

---

[9]On August 7, however, Cisco gave a statement to police implicating the defendant as the shooter.

they were obtained in violation of his rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, the Massachusetts Declaration of Rights, and the Massachusetts wiretap act. Those motions were denied by three different judges, none of whom was the trial judge. The judges found that the statements were made voluntarily, after proper Miranda warnings; that the statements were not coerced by police; and that the defendant did not have a reasonable expectation of privacy in the telephone calls.

During the final few weeks before trial was scheduled to begin, along with a number of other preliminary motions, the defendant filed two motions in limine to exclude on evidentiary grounds all or portions of his statements to police and the jailhouse calls. The defendant asserted that the statements were inadmissible because they were unequivocal denials of police accusations, see *Commonwealth* v. *Womack*, 457 Mass. 268, 273-274 (2010) (*Womack*); *Commonwealth* v. *Nawn*, 394 Mass. 1, 4 (1985) ("our long-standing rule [is] that if a defendant is charged with a crime and unequivocally denies it, that denial is not admissible in evidence"), or because they were more prejudicial than probative. See *Ruszcyk* v. *Secretary of Pub. Safety*, 401 Mass. 418, 422-423 (1988). The judge conducted two hearings on the motions, on February 15 and February 18, 2011, and reviewed the audio and video recordings prior to the second hearing. At the end of that hearing, the judge encouraged counsel to file supplementary papers regarding issues raised at the hearings; the prosecutor filed a twenty-page supplemental memorandum.

The judge then issued two comprehensive written decisions ordering that portions of the three interviews, and six of the eight telephone calls, be excluded, because they constituted police accusations that the defendant unequivocally denied, were not relevant to any matter in the case, or were substantially more prejudicial than probative.[10] The judge stated explicitly that his rulings were subject to revision depending upon how

---

[10]In those portions of the defendant's statements to police that the judge concluded were admissible, the defendant provided varying versions of his whereabouts and the people he was with on the night of the shooting, made contradictory statements about his knowledge of particular streets in Worcester

events unfolded at trial. The judge denied the Commonwealth's motion for a stay in order to file before a single justice of this court an application for leave to pursue an interlocutory appeal pursuant to Mass. R. Crim. P. 15 (e), as appearing in 422 Mass. 1501 (1996).

Maintaining that the motions in limine "sought to exclude most of the Commonwealth's incriminating evidence," the Commonwealth filed an emergency petition for extraordinary relief pursuant to G. L. c. 211, § 3. In its petition, the Commonwealth argued, as it now does on appeal, that the judge misapplied the rules of evidence regarding statements by a party opponent, misconstrued the meaning of an unequivocal denial, failed properly to weigh the probative value of the excluded evidence, and improperly foreclosed argument on the weighing of probative value against prejudicial effect. The Commonwealth asserted that the evidence which the judge had ordered excluded was "critical," "irreplaceable," and "crucial to the prosecution of" the Commonwealth's case. On this asserted basis, the single justice granted the petition for extraordinary relief, ordered that proceedings in the Superior Court be stayed, and ordered the Commonwealth to file an interlocutory appeal, pursuant to Mass. R. Crim. P. 15 (a) (2), as appearing in 422 Mass. 1501 (1996).[11]

and his relationship with Tito, and gave a detailed description of Cisco's heading off to kill the victim's brother on the night the victim was killed. Based on these statements, the Commonwealth may seek to argue at trial, as it maintains it sought the admission of the statements to do, that the defendant's varied accounts, and his suggestions that others were responsible, are probative of consciousness of guilt.

In no portion of the statements, to police or others, excluded or ruled admissible, did the defendant admit to shooting the victim, being present at the scene, having any antagonism toward Tito, or suspecting any infidelity on the part of Jenesca. He admitted to having been in the Corolla with Cisco, Monroy, and O'Brien earlier on the night of the shooting, as they traveled between clubs, but maintained that he was outside his mother's house "partying" at least between 3 A.M. and 6 A.M., when he went to bed.

[11]Rule 15 (a) (2) of the Massachusetts Rules of Criminal Procedure, as appearing in 422 Mass. 1501 (1996), permits parties to seek leave to pursue an interlocutory appeal of the denial of a motion to suppress. The rule does not encompass other interlocutory rulings, in part for sound reasons of judicial economy, as such "ruling[s] [are] subject to change when the case unfolds . . . . Indeed even if nothing unexpected happens at trial, the . . . judge is free, in the exercise of sound judicial discretion, to alter a previous in limine

The single justice then allowed the appeal to proceed before this court.

On appeal, the Commonwealth augments its claims of palpable error in the exclusion of the recorded material by repeated reference to the two motion hearings. Looking to comments made there rather than to the judge's subsequent written memoranda of decision, the Commonwealth contends that the judge "confus[ed] the concept of admissions by a party-opponent with declarations against interest," and that his analysis of whether statements were more prejudicial than probative "was influenced by his erroneously narrow view of admissible statements by a party-opponent." The Commonwealth asserts that the judge "compounded these errors by blocking the Commonwealth's attempts to show the relevance of the statements by reference to other admissible evidence, and by never permitting argument on the statements' probative value versus the danger of unfair prejudice."

2. *Discussion.* a. *Propriety of motions in limine.* The Commonwealth maintained during the hearing on the motions in limine, and argued in its application for leave to pursue an interlocutory appeal, that it was improper for the trial judge to have considered these motions, because the defendant's prior motions to suppress the statements as violations of his constitutional rights had been denied by other judges.[12] The Commonwealth claimed, as it does implicitly throughout its brief to this court, that the exclusions of portions of the defendant's statements are "suppressions" of evidence. That the statements were determined to be admissible on constitutional grounds,

---

ruling." *Luce* v. *United States,* 469 U.S. 38, 41-42 (1984). We have held previously, however, that "if a motion to exclude all or most of the Commonwealth's . . . evidence is allowed, and if, as a practical matter, that ruling (if permitted to stand) would terminate the prosecution, the Commonwealth may seek leave to appeal pursuant to Mass. R. Crim. P. 15 [(a) (2)]." *Commonwealth* v. *Anderson,* 401 Mass. 133, 135 (1987).

[12]The prosecutor argued:

> "Now, once [a defendant's statements] are voluntary, they come into evidence. I have never seen anyone reexamine motions to suppress before the trial the second time as a — under the color of a motion in limine, which it's not, and ask for a second ruling. These have all been heard by a Superior Court judge. They have all been denied."

however, did not in any way foreclose further inquiry as to whether they should be admitted at trial.[13]

The motions in limine focused on issues distinct from whether the defendant's statements were coerced or were made knowingly, intelligently, and voluntarily. They instead addressed questions of hearsay, probative value, and prejudice. See Mass. G. Evid. § 403 (2012) ("Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, being unnecessarily time consuming, or needless presentation of cumulative evidence"). Motions in limine concerning the introduction or exclusion of purportedly relevant evidence are properly made and considered before and during trial, in advance of the evidence being offered. See, e.g., *Womack, supra* at 273-274; *Commonwealth* v. *Cruz*, 373 Mass. 676, 691-692 (1977); *Commonwealth* v. *Locke*, 335 Mass. 106, 115 (1956); *Commonwealth* v. *Twombly*, 319 Mass. 464, 465 (1946). Indeed, the need for consideration whether certain proffered evidence should be admitted may not become apparent until the trial is underway.[14]

---

[13]In his decision on the motion to suppress the defendant's statements to police, a different Superior Court judge stated explicitly that it was for the trial judge to determine if the statements were more prejudicial than probative.

[14]In considering a pretrial motion in limine to exclude evidence as more prejudicial than probative, a judge confronts a difficult balancing act. On the one hand, particularly where the motion involves a defendant's statements, the parties need to frame their opening statements appropriately. On the other hand, evidence may be more probative (or more prejudicial) when considered in conjunction with other evidence that might be introduced as the trial unfolds, or anticipated evidence, relied upon in a pretrial ruling, may not develop as planned. Moreover, as the judge recognized, before trial commences, the parties are frequently far more familiar with the anticipated evidence than the judge, who is being presented with it for the first time. Compounding the difficulty, particularly as the Commonwealth more frequently seeks to play video recordings of defendants' statements for the jury, see *Commonwealth* v. *DiGiambattista*, 442 Mass. 423, 447 449 (2004), are considerations involving the electronic equipment, expertise in the use of such equipment, and preparation time required to redact a videotape, a compact disc, or a digital video disc. These make midtrial decisions more complicated to implement and more likely to cause disruption in the flow of trial.

Clearly recognizing these countervailing considerations, the trial judge engaged in a careful and detailed analysis, limiting opening statements on specific topics in an exercise of caution, and explicitly noting that his ruling was subject to review as the record developed: "And, of course, it's hard for me to rule prior to what I hear on the stand. So I am basing these rulings on

b. *Opportunity to argue.* The Commonwealth maintains that it was prevented from arguing the probative value of certain evidence that the judge then excluded. It relies in this regard on comments made at the hearings on the motions in limine concerning the extent of the "context" in which a statement must be evaluated to determine its probative value. Our review of the record, however, discloses no basis on which to conclude that the Commonwealth was precluded from arguing the probative value of the contested evidence.

The defendant's motions in limine, as well as his argument at the two hearings, focused on his view of the prejudicial effect of the statements relative to their probative value. The Commonwealth was free to, and did, argue the contrary; at times, the judge expressed scepticism with the Commonwealth's proposed interpretation. Following the hearings, and at the judge's invitation to the Commonwealth to file additional material, the Commonwealth submitted an extensive supplemental memorandum. The Commonwealth elected to focus its supplemental argument on whether the defendant's statements were admissible as statements of a party opponent, rather than on an analysis of the relative weight of the statements' probative value and prejudicial effect. That was its choice. However, given the judge's repeated assurances that his rulings on the motions in limine are preliminary and can be revisited as the evidence unfolds at trial, both the Commonwealth and the defendant will have ample opportunity for further argument on such matters.

c. *The trial evidence.* The Commonwealth has asserted that the excluded recordings comprise "most of the Commonwealth's evidence," a characterization that does not withstand close scrutiny of the record.

To prove its case, the Commonwealth plans to introduce testimony from Tito, Jenesca, Cisco, the other alleged occupants of the Toyota Corolla on the night of the shooting, individuals in the crowd outside Tito's house, who recognized the gray Corolla with its distinctive "donut" front tire as Monroy's vehicle, and the defendant's former cellmate, to whom the defendant is alleged to have made incriminating statements. The Com-

---

offers. If it turns out that something occurs in the course of the trial that requires me to revisit my ruling, I have to do that . . . ."

monwealth also intends to call Brianna, the defendant's other girl friend, with whom the defendant told police he spent time early in the evening on July 28; Brianna informed police that the defendant telephoned her approximately ninety minutes before the shooting. In addition, the judge allowed the Commonwealth's motion to introduce Tito's testimony concerning the shooting on July 26, as well as a physical altercation between the defendant and Tito during a street fight on July 18.[15] The Commonwealth also plans to introduce ballistics evidence indicating that the bullets that killed Arocho-Ortiz were fired from the gun[16] found outside the defendant's sister's house,[17] and cellular telephone records and cellular tower records showing the defendant's movements and contacts on the night of the shooting.

Given the gravity of the charges, we recognize the Commonwealth's concern over the exclusion of any of its proffered evidence. The evidence that the judge ordered excluded, however, which the Commonwealth maintains is critical to establish identity, motive, and consciousness of guilt, is at best tenuous as to those questions. Moreover, while it is never incumbent upon the Commonwealth to establish motive or consciousness of guilt, the Commonwealth nevertheless has substantial other evidence of identity, motive, and consciousness of guilt, including the statements of the three occupants of the vehicle used in the shooting and the testimony of the person the Commonwealth

[15]Of the two prior bad acts, the defendant was charged only in connection with the July 26 incident; that charge subsequently was dismissed at the Commonwealth's request. Concluding that any prejudicial effect would be substantially outweighed by their probative value regarding the defendant's motive, the judge denied the defendant's motion to exclude Tito's proffered testimony concerning the July 18 and July 26 incidents.

[16]The Commonwealth anticipates calling a ballistics expert to testify that the six bullet casings found at the scene of the shooting were consistent with having been fired from a gun that may bear the defendant's fingerprint that was recovered from the backyard of the defendant's sister's house.

[17]The gun was found by a downstairs neighbor of the defendant's sister Jessica, moved, and then shown to police. The neighbor found it in the area for trash disposal in the back yard, and also found a broken window in his apartment that opened to the back porch. The Commonwealth's theory is that the gun was thrown through the window into the back hallway by the driver of the Corolla, and then subsequently disposed of in the trash containers, at the defendant's request.

asserts was the intended victim. Were the judge's preliminary rulings concerning the excluded recordings permitted to stand, it would not as a practical matter "terminate the prosecution." *Commonwealth* v. *Anderson*, 401 Mass. 133, 135 (1987). See Mass. R. Crim. P. 15(a)(2). Even had the judge allowed the defendant's motion to exclude the recordings in their entirety, the Commonwealth would still have ample evidence upon which to proceed to trial.

d. *Tainted legal analysis.* The Commonwealth's brief relies extensively on the judge's comments during the hearings on the motions in limine rather than on the analysis in the judge's comprehensive written memoranda of decision. It does so notwithstanding its acknowledgment that the judge "did not rely upon the hearsay rule he articulated at the hearing when finally deciding on which basis to exclude the evidence." This is apparently based on its view that the judge's analysis during the hearings was so flawed, the "fallacy in [his] reasoning" tainted the subsequent written rulings.

Certain of the judge's comments during the two extensive hearings did indicate a misapprehension of the admissibility of extrajudicial statements by a party opponent where that opponent is a criminal defendant. The Commonwealth vigorously opposed this interpretation at both hearings. As stated, prior to issuing his written decisions, the judge invited both parties to supplement their filings and to submit any relevant case law. In response, the prosecutor submitted a twenty-page supplemental memorandum. We look to the judge's thorough written decisions, made after consideration of the arguments at the hearings and the parties' papers, rather than to the "thinking out loud" type of comments he made while grappling with the scope of the relevant law and seeking comment from counsel in considering different analyses.[18] Cf. *Ray* v. *Commonwealth*, 463 Mass. 1, 4 (2012) (judge's statement at hearing that he was inclined to

[18]More generally, we are reluctant to foreclose a judge's ability to engage with the issues by seeking comments from counsel on various hypothetical situations or on a proposed analysis, and musing on their potential outcomes. Such a result would not be consonant with the administration of justice. To the contrary, it would deprive the judge, and the parties, of a valuable tool by which to advance and evaluate arguments precisely when dialogue in considering complex issues could be most helpful. See, e.g., R.A. Posner, The Federal

rule in one way did not support inference that he had foreclosed other alternatives); *State* v. *Wilson*, 243 Or. App. 464, 469 (2011) (judge's colloquy "more closely resembles the thinking out loud of a judge struggling with a troubling and difficult decision that is not susceptible to [nor intended to be subjected to] the kind of analysis that we apply to statutes or written judicial opinions"). We review the conclusions of law in the judge's memoranda of decision de novo. See *Rhodes* v. *AIG Domestic Claims, Inc.*, 461 Mass. 486, 495 (2012).

e. *Statements by a party opponent.* An extrajudicial statement made by a party opponent is an exception to the rule against the introduction of hearsay, and is admissible unless subject to exclusion on other grounds. See *Commonwealth* v. *Allison*, 434 Mass. 670, 676 n.5 (2001); Mass. G. Evid. § 801(d)(2)(A) (2012). Although often referred to as the rule on "admissions" by a party opponent, it encompasses any extrajudicial statement made by a party opponent regardless whether it is inculpatory or against the party's interest. See *Commonwealth* v. *Cutts*, 444 Mass. 821, 834 (2005), citing P.J. Liacos, M.S. Brodin, & M. Avery, Massachusetts Evidence § 8.8.1, at 496 (7th ed. 1999). See also *Care & Protection of Sophie*, 449 Mass. 100, 110 n.14 (2007).

It is well established, however, that if the extrajudicial statement by a criminal defendant is an unequivocal denial of an accusation, it, and the accusation it denies, are inadmissible. Our longstanding rule held that such accusations and denials were inadmissible on the ground that, similar to comments on a defendant's silence in response to having been advised of the right to remain silent, such accusations and denials are impermissible comments on a defendant's invocation of that constitutional right. See *Womack, supra* at 273; *Commonwealth* v. *Trefethen*, 157 Mass. 180, 197 (1892). Recently, however, we explained that the proper rationale for excluding accusations and denials is that they constitute inadmissible hearsay. See *Womack, supra.*

Courts: Crisis and Reform 120 (1985); Seventh Annual Judicial Conference of the United States Court of Appeals for the Federal Circuit, 128 F.R.D. 409, 537 (May 24, 1989) (statement of Paul R. Michel, Judge of the Federal Circuit Court of Appeals); Bright, The Power of the Spoken Word: In Defense of Oral Argument, 72 Iowa L. Rev. 35, 36 (1986); Wald, Bureaucracy and the Courts, 92 Yale L.J. 1478, 1484 (1983).

While statements to police are now frequently recorded, see
*Commonwealth* v. *DiGiambattista*, 442 Mass. 423, 447-449
(2004), the availability of a recording has not changed the rule
that neither the accusations nor the denials are admissible.

Although focusing on whether a statement is an "admis-
sion," i.e., inculpatory, would be improper in determining
whether a criminal defendant's statement is admissible as a
statement by a party opponent, see *Care & Protection of Sophie*,
*supra*, the judge did not adopt such an analysis in his written
decisions. Rather, the judge held:

> "Whether or not the SJC has rejected the broad use of
> any 'statement of a party-opponent' that is suggested by
> the proposed Rule 801(d)(2), and the Commonwealth's
> argument here, is for that body to articulate. What is clearer
> to the undersigned is that . . . the admissibility of state-
> ments here hinges on a factual determination of whether
> there is an unequivocal denial of the charges by the defend-
> ant in all or part of the statements. Thereafter, it must be
> determined whether the probative value of such statement
> is substantially outweighed by its prejudicial effect."

This two-part analysis indicates that the judge considered the
defendant's extrajudicial statements to be admissible unless he
determined that they were unequivocal denials, see *Womack*,
*supra*, or that their probative value was substantially outweighed
by their prejudicial effect. See *Commonwealth* v. *Bonds*, 445
Mass. 821, 831 (2006). In other words, he properly considered
the defendant's extrajudicial statements to be admissible unless
subject to exclusion on other grounds.

f. *Evidentiary rulings.* The Commonwealth essentially takes
the position that, with minor exceptions, it should be permitted
to introduce the three recorded interviews with police and the
eight recorded jailhouse telephone calls in their entirety. It
agrees that incidental references to drugs[19] should be excluded,

---

[19]To the extent that the judge excluded portions of the recorded statements
making reference to the defendant in handcuffs, the administration of the
Miranda warnings, the defendant's alcohol and drug use and being a drug sup-
plier, his gang affiliation, his experience with the criminal justice system and
prior incarceration, his friendships with people he met in prison or with whom

and that the statements made and questions posed by police should be admitted with limiting instructions.

i. *Standard of review.* Evidentiary rulings on a motion in limine are "left to the sound discretion of the trial judge, and we review only for abuse of that discretion." *Commonwealth* v. *Arrington*, 455 Mass. 437, 441 n.6 (2009). A party who "claims an abuse of that discretion assumes a heavy burden. That burden is not met by merely arguing that on a debatable question of admissibility the judge ruled against the defendant while another judge could and might have ruled in his favor." *Commonwealth* v. *Bys*, 370 Mass. 350, 360-361 (1976). Rather, the party must show that "no conscientious judge, acting intelligently, could honestly have taken the view expressed by him." *Davis* v. *Boston Elevated Ry. Co.*, 235 Mass. 482, 502 (1920). Whether proffered "evidence is relevant and whether its probative value is substantially outweighed by its prejudicial effect are matters entrusted to the trial judge's broad discretion and are not disturbed absent palpable error." *Commonwealth* v. *Sylvia*, 456 Mass. 182, 192 (2010), quoting *Commonwealth* v. *Simpson*, 434 Mass. 570, 578-579 (2001).

ii. *Police accusations and comments.* Significant portions of the recorded statements which the judge excluded are not the defendant's statements at all, but, instead, questions by the detectives setting forth their theory of events, or the hearsay accusatory statements of third parties. The Commonwealth argues that "questions, statements, and accusations by police" during the interviews are not offered for their truth, but must be admitted in order for the jury "to understand the meaning of the defendant's responses to them," and to "place the defendant's answers in context." Opinions of the interrogating detectives that the defendant is guilty and lying, see *Commonwealth* v. *Woods*, 419 Mass. 366, 375-376 (1995), and police reiteration of accusations by third parties that the defendant has denied, are not admissible. See, e.g., *Commonwealth* v. *Santos*, 463 Mass. 273, 288-289 (2012), and cases cited; *Commonwealth* v. *Emeny*,

he served time, and his familiarity with the Miranda warnings, we presume the Commonwealth would include these in the "extraneous and irrelevant references" category of properly excluded material. In any event, the judge did not abuse his discretion in excluding such matters, comprising a not inconsiderable portion of what was excluded.

463 Mass. 138, 148-149 (2012); *Womack, supra* at 270-273; *Commonwealth* v. *Locke*, 335 Mass. 106, 115 (1956). A statement by a defendant that may be admissible at trial is just that: the defendant's statement. "We do not imply that police may not use accusatory statements as an investigative tool. Our rule simply excludes such statements from evidence if they were denied."[20] *Womack, supra* at 272 n.4. See *id.* at 276 (where defendant's general denial of accusation is admitted erroneously in evidence, "[t]he core of any prejudice is more likely caused by admission of the accusations than the denials").

The Commonwealth points particularly to excluded hearsay accusations by police officers concerning the alleged assault against Tito on July 26, and to the discussion of the defendant's purported suspicions that Tito, rather than the defendant, might be the father of Jenesca's child, as critical evidence of motive. However, the judge allowed the Commonwealth's motion, over the defendant's opposition, that Tito be permitted to testify directly to that assault and to the defendant's suspicions, as well as to an earlier alleged assault.

---

[20]Our ruling in *Commonwealth* v. *DiGiambattista*, 442 Mass. 423, 447-449 (2004), encouraging the recording of a defendant's statement to police, was intended to assure that testimony that the Commonwealth offered concerning what a defendant had said to police was an accurate reflection of the defendant's own words. *Id.* at 442, 445-447. It was not intended to render the entirety of such recorded sessions admissible. *Id.* at 447 & n.23. The recent availability of recorded interviews containing the statements of police as well as of the defendant, however, might well be viewed by the Commonwealth as an opportunity to introduce, as an asserted portion of the defendant's statement, those questions and statements by police to which the defendant responded. Absent such a recording, of course, those statements and questions by police would likely not have been available, see, e.g., *Commonwealth* v. *Santos*, 463 Mass. 273, 287-289 (2012), and *Commonwealth* v. *Emeny*, 463 Mass. 138, 147-149 & n.11 (2012), given that officers manually taking notes of a defendant's statement would tend generally to write down the defendant's words, rather than their own. See *Commonwealth* v. *Woodbine*, 461 Mass. 720, 734 n.19 (2012); *Commonwealth* v. *McNulty*, 458 Mass. 305, 319 n.14 (2010); *Commonwealth* v. *DiGiambattista, supra* at 446. Cf. *Commonwealth* v. *McNulty, supra* at 321-323. Here, for example, the prosecutor responded to the judge's inquiry as to the impact of the excluded portions of the recordings by saying, "[I]t's significant evidence . . . that we spent literally hundreds upon hundreds of hours getting ready on. This case has literally taken me approximately twenty-five hundred hours to prepare. I want to go with the full case." The fact that everything said in an interview is recorded and available, however, does not itself make all or any portion of it admissible.

iii. *Consciousness of guilt.* The Commonwealth states also that the excluded statements to police are necessary to establish consciousness of guilt because the defendant's contradictory statements permit an inference that he was lying about events on the night of the shooting. Here again, the judge allowed admission of the defendant's differing statements concerning his whereabouts and companions on the night of the shooting, his knowledge of the location of the shooting, and his knowledge of Cisco's involvement in the shooting. Moreover, as the judge indicated, the defendant's statement that Cisco had planned to shoot the victim's brother that night would permit the inference the Commonwealth seeks to draw, that the defendant's efforts to implicate others show consciousness of guilt.[21]

iv. *Unequivocal denials.* The Commonwealth contends that the judge erred in his interpretation of what constitutes an "unequivocal denial." The essence of the Commonwealth's claim in this regard is that the defendant's varying statements concerning his whereabouts and his knowledge of Tito, and his denials of police accusations during the three interviews, cannot be viewed as "denials of some discrete questions of fact." Rather, the statements must be considered together and, when seen as a whole, are "demonstrably false" because they contradict one another. Accordingly, "[t]he fact that the defendant used the superficial language of denials as to some discrete facts does not render the statements inadmissible"; because, on this analysis, the statements are false, they must be admitted as evidence of consciousness of guilt. As we said in *Commonwealth* v. *Diaz,* 453 Mass. 266, 273 (2009), however, if inconsistent statements of denial by a defendant in response to police accusations were admissible as consciousness of guilt, "the rule prohibiting evidence of statements of denial would be eviscerated, because every denial would then become admissible as evidence of consciousness of guilt."

For purposes of analysis, the judge divided the July 29 interview into four sections, and the July 30 interview into three

[21]The judge also allowed introduction of two apparently coded jailhouse calls that the Commonwealth argues involve the defendant asking others to hide or destroy evidence, specifically the gun used in the shooting, which was purportedly hidden in one of the defendant's sisters' back hallways.

sections. Three of those sections involve repeated questioning about "Francisco Rivera's" allegations concerning the purported shooting on July 26, whether the defendant had a "beef" with "Francisco," and whether "Francisco" had any reason to believe that the defendant had "issues" with "Francisco" concerning the paternity of the defendant's child, all of which the defendant unequivocally and repeatedly denied. Many of the questions either explicitly accused the defendant of lying, or asked him to explain why others would say he had done something if he had not. In response, the defendant insisted repeatedly that whoever made the allegations was lying, and that the allegations were untrue or "crazy."

The judge properly ordered these sections — the second and fourth parts of the July 29 interview, and the third part of the July 30 interview — excluded as unequivocal denials of police accusations. He noted that, while the statements are relevant for the limited purpose of establishing motive, Tito is expected to testify to the alleged assault. Thus, the evidence which the Commonwealth asserts is essential to establishing the defendant's motive will be admitted directly, rather than through hearsay statements reporting what Tito is said to have told police.

After reaching this conclusion, the judge observed correctly that many of the statements in these sections are also inadmissible on other grounds. He carefully parsed each section, noting specific statements that are far more prejudicial than probative, see note 14, *supra*, and others that are not relevant to any matter the Commonwealth must prove at trial.[22]

v. *Jailhouse telephone calls.* The Commonwealth argues that the judge "usurped the role of the jury" in excluding "highly

---

[22]The judge noted also that the second section of the July 29 interview involved apparent confusion, both by police and by the defendant, concerning the identity of the purported target. See notes 4-6, *supra*. He concluded that, in addition to being inadmissible as unequivocal denials, and highly prejudicial, this confusion further reduced any limited probative value of these statements, such that any probative value was substantially outweighed by their prejudicial effect. The Commonwealth claims that the judge's decision improperly removed from the jury a determination whether there was actual confusion. In the circumstances, we cannot say that this was an abuse of discretion. See *Commonwealth* v. *Rosa*, 422 Mass. 18, 25 (1996) ("When prejudice, including confusion of the jury, is possible, the judge must weigh the probative value of the evidence against such danger").

probative jailhouse calls." Determinations whether proffered evidence is more prejudicial than probative are "entrusted to the trial judge's broad discretion and are not disturbed absent palpable error." *Commonwealth* v. *Simpson*, 434 Mass. 570, 578-579 (2001). Although, in some excluded portions, another judge reasonably might have weighed differently the probative value of the defendant's statements, or their prejudicial effect, we cannot say that the judge's determinations were an abuse of discretion.[23] See *Commonwealth* v. *Bys*, 370 Mass. 350, 360-361 (1976).

Of the eight jailhouse telephone calls, one took place on August 2 (5R), four on August 3 (10R, 13R, 14R, and 15R), one on August 8 (29R), and two on August 14 (58R and 59R). The Commonwealth maintains that six of the calls show consciousness of guilt, because they concern the defendant's efforts to induce others to hide evidence or to establish an alibi. The Commonwealth maintains also that two calls between the defendant and Jenesca, in which they argue about the defendant's relationship with Brianna, are relevant to consideration of the defendant's alibi, since Brianna told police that the defendant had telephoned her approximately ninety minutes before the shooting.

Although they make no direct reference to it, instead discussing "sneakers," "something" downstairs, and "a party," the Commonwealth argues that three of the calls involve the defendant's efforts to dispose of the gun used in the shooting. The judge ruled that the first call on August 3 (10R) and the second call on August 14 (59R) are admissible to show consciousness of guilt, since, in each, it could be inferred that the defendant was asking someone to hide or destroy evidence.

The third call the Commonwealth contends is a coded conversation about disposing of the murder weapon,[24] between the defendant, Jenesca, and an unidentified male (58R), is largely

---

[23]The judge's preliminary rulings concern only the substantive admissibility of the recorded conversations. Whether any portion of those recordings can be used for other purposes, such as impeachment, awaits consideration at trial. Further, in the event that testimony does not come in as expected, otherwise admissible portions of the recordings, excluded by the preliminary rulings, might take on different probative value, and cause the calculus involving prejudice to shift.

[24]As the defendant points out, during the interview on August 3, eleven

indecipherable. The judge determined that, even if the inferences the Commonwealth suggested were plausible and its interpretation reasonable, the statements were made by the unidentified male, and the defendant did not clearly adopt them; indeed, Jenesca appeared to think that the defendant did not know what the unidentified male was talking about. Jury confusion is a factor properly to be considered in weighing the prejudicial nature of proffered evidence. *Commonwealth* v. *Rosa,* 422 Mass. 18, 25 (1996). See Mass. G. Evid. § 403 (2012). Furthermore, the call was cumulative of the two other calls the judge deemed admissible. See *Commonwealth* v. *Bonds,* 445 Mass. 821, 831 (2006); Mass. G. Evid. § 403 (2012).

As to the calls purportedly showing the defendant's efforts to concoct an alibi, we discern no abuse of discretion in the judge's conclusion that they are more prejudicial than probative. The Commonwealth argues that the defendant's statements to Jenesca in the August 2 call (5R), disagreeing with what Cisco is telling people about the crime, and asking why Cisco is not "hold[ing] him down," are expressions of the defendant's frustration that Cisco is refusing to lie for him about a fabricated alibi. The judge noted that the defendant's "commentary on another's credibility or motive does not have the probative value asserted by the Commonwealth, but is, rather, in line with a general protestation of innocence."

The Commonwealth asserts also that, in two calls between the defendant and Cisco (13R and 14R), the defendant attempts to concoct an alibi with Cisco. The judge described the calls as essentially "one-sided" statements by Cisco. While acknowledging that portions of the conversations could be interpreted as Cisco's efforts to concoct an alibi for the defendant, the judge concluded that the defendant did not agree with or adopt any of those statements. Instead, his role in the conversations was limited to seeking information regarding what people in the community were saying. See *Commonwealth* v. *MacKenzie,* 413 Mass. 498, 506 (1992) (if "party remains silent or responds

days before this telephone call, police informed the defendant that they had already found the gun at his sister's house on Claremont Street. Hence, there was no gun to be disposed of at the time of the call. The defendant's counsel maintained that the jailhouse call involved illegal drugs.

equivocally" where reasonable person would challenge accusatory statement, response may be admissible as party's admission, but we approach such evidence "with caution. . . due to the fact that the meaning of a defendant's response, or lack thereof, to an accusatory statement is often ambiguous"). Moreover, large portions involve highly prejudicial comments about the price reportedly put on the defendant's head, or statements by Cisco, who is expected to testify at trial, concerning his own proffered alibi, that are neither relevant to any matter the Commonwealth must prove at trial, nor statements by the defendant.

The judge ruled that the calls between the defendant and Jenesca (15R and 29R), in which Jenesca accuses the defendant of infidelity with Brianna, based on what Cisco and Brianna had said, contain inadmissible hearsay statements by others and no relevant statements by the defendant. The judge concluded properly that if any of Brianna's statements are relevant to the defendant's alibi, they may be admitted directly through Brianna.

*Conclusion.* We affirm both the order allowing the defendant's motion in limine to exclude his statements to police and the order allowing in part and denying in part the defendant's motion in limine to exclude the recordings of his jailhouse telephone calls. The case is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*