HARRISON, COMMONWEALTH vs., 100 Mass. App. Ct. 376

 
 COMMONWEALTH vs. SHAUN HARRISON.

100 Mass. App. Ct. 376
 June 4, 2021 - October 12, 2021

Court Below: Superior Court, Suffolk County
Present: Green, C.J., Vuono, Shin, Ditkoff, & Walsh, JJ.

 

Armed Assault with Intent to Murder. Assault and Battery by Means of a Dangerous Weapon. Firearms. Controlled Substances. Due Process of Law, Disclosure of evidence. Evidence, Disclosure of evidence, Videotape, Alibi, Identification, Spontaneous utterance, Expert opinion, Prior misconduct, Firearm. Practice, Criminal, Disclosure of evidence, Admissions and confessions, Duplicative convictions, Affirmative defense, Required finding, Sentence. Witness, Expert, Victim.

At a criminal trial, the Superior Court judge did not abuse his discretion in denying the defendant's motion for a mistrial based on the Commonwealth's unintentional delayed disclosure of a videotape of a police interview with a key witness who had already testified that was exculpatory in nature, where in view of the entire record and the remedial measures offered by the judge (i.e., ordering the Commonwealth to make available to defense counsel for questioning all police officers associated with the interview, keeping the key witness available should defense counsel choose to recall him, and providing defense counsel with an expedited transcript of the interview to assist in his review) and defense counsel declining when asked by the judge to request any further remedial measures, defense counsel would not have been able, even if there had been timely disclosure, to use the videotape of the interview to create a reasonable doubt that would not otherwise have existed [383-386]; further, the judge did not err in admitting a portion of the videotaped interview in which the defendant denied having been with victim on the evening of the shooting and, in response to being told that videotaped footage showed a person resembling the defendant in the area of the shooting, denied that it was him, where, even accepting, arguendo, that some of the exchanges in question would qualify as a denial, the denials were made prior to his arrest, and in any event, considering the strength of the Commonwealth's case in its entirety, admission of the defendant's voluntary prearrest statements to the police regarding his relationship with the victim and the defendant's whereabouts on the night of the shooting (most of which were in his interest) did not create a substantial risk of a miscarriage of justice [386-387].

Even assuming without deciding that the admission of evidence at a criminal trial concerning the defendant's tattoo lacked relevance to any issue in the case, the passing mention of the tattoo did not, in consideration of the Commonwealth's case as a whole, materially influence the verdict such that 

 Page 377 

it created a substantial risk of a miscarriage of justice, in that the Commonwealth was prohibited explicitly from introducing evidence of gang affiliation, the parties meticulously avoided eliciting any such testimony throughout the trial, the defendant provided a perfectly benign explanation for the tattoo in his police interview, and the tattoo was never again referenced at trial. [387-388]

At a criminal trial, evidence of the defendant's whereabouts and his companions on the night of the shooting (i.e., the defendant's statements in a videotaped interview with police that he stayed home with his sons on that night) undoubtedly was probative regarding whether he was with the victim at the time of the shooting, and the statements were properly admissible as those of a party opponent; moreover, accepting arguendo that it was error to admit the statements, there was no substantial risk of a miscarriage of justice, where the defendant was under no obligation to present evidence and therefore well within his right to make the tactical decision not to call witnesses (a point the judge emphasized to the jury). [388]

At a criminal trial, there was no abuse of discretion in the admission of a video recording as an out-of-court identification of the defendant by the victim while the victim was in the hospital, where the victim had been able to perceive the defendant to be the shooter by earlier visual contact, hearing the defendant speaking behind him, and later seeing that he had fled the scene; where the recording was probative of the identification of the shooter; and where the jury were able to evaluate and physically observe the victim when he testified at trial, including the physical scars from the shooting. [388-390]

At a criminal trial, the judge did not abuse his discretion in admitting as excited utterances statements made by the victim while he was in the hospital, where the judge reasonably concluded that a young person, in considerable pain and receiving emergency treatment for a gunshot to the back of the head (an injury most would understand to be life threatening), would not have had sufficient time and presence of mind to reflect and fabricate a story that his school counsellor was the culprit; and where, further, the defendant had ample opportunity to confront the victim through cross-examination. [390-391]

At a criminal trial, the judge did not abuse his discretion in admitting expert testimony from the doctor who treated the victim, where it was clear that a notation indicating allowance of the defendant's motion in limine to exclude the testimony was a scrivener's error, and where, even accepting arguendo that testimony regarding the possible trajectory of the bullet should have been excluded, defense counsel's cross-examination of the doctor effectively nullified any prejudice because the doctor acknowledged that the victim's injury was not life threatening and thus the challenged statements had but a slight effect on the jury. [391-392]

At a criminal trial, there was no error in the admission of the victim's testimony that he visited the defendant's apartment and they listened to "trap" or "gang banging" music, and that the defendant showed him a firearm, where the victim's description of the firearm was relevant, in that it did not match any of the firearms found in the defendant's apartment and thus would support the inference that it was the weapon used in the shooting; and where the testimony demonstrated the victim's music preferences at the time rather than the defendant's. [392]

 Page 378 

There was no error in the admission, at a criminal trial, of a remark that the defendant volunteered to police that a student at a previous school where the defendant had worked had made an unfounded accusation that the defendant sold drugs, where the evidence was admissible as a statement of a party-opponent, and where it was reasonable to infer that the defendant was attempting to deflect suspicion of his involvement in the crime by preemptively discrediting any students, including the victim, whom the defendant anticipated would say he recruited to sell drugs. [392-393]

A criminal defendant's convictions of carrying a firearm without a license and unlawful possession of ammunition were not duplicative of his conviction of assault and battery by means of a dangerous weapon causing serious bodily injury, where, given that the offense of assault and battery by means of a dangerous weapon causing serious bodily injury does not define "dangerous weapon," the Commonwealth was not required to prove knowing possession of a dangerous weapon, or that the dangerous weapon used met the legal definition of either "firearm" or "ammunition." [393-395]

A criminal defendant convicted of charges predicated on his possession of a rifle and shotgun and corresponding ammunition without a valid firearm identification (FID) card was not subject only to civil penalties under G. L. c. 140, § 129B (12), on the ground that he once held an FID card to possess the rifle and shotgun found in his apartment, where, in order to avail himself of an affirmative defense under § 129B, the defendant had the burden to produce at least some evidence that the sole reason he did not have a valid FID card was because it had been allowed to lapse. [395-396]

At the trial of indictments charging, inter alia, possession of a twelve-gauge shotgun without a valid firearm identification card, although an expert witness did not explicitly testify that he test-fired the shotgun, in viewing all the evidence and permissible inferences in the light most favorable to the Commonwealth, there was competent evidence sufficient to sustain the defendant's conviction, in that the jury were told that the expert's examination of a firearm invariably entailed a safety check and test-firing, provided the firearm appeared safe to use; the expert averred that he examined the shotgun and, based on that examination, concluded that it met the legal definition of a firearm; and thus the jury could reasonably infer that, because the expert's firearm examination process entailed test-firing to assess functionality, the expert concluded that the shotgun met the legal definition of a firearm only because it successfully test-fired. [396]

This court vacated a criminal defendant's sentences and remanded the case for resentencing, where the judge at the sentencing hearing erroneously stated that the defendant's conviction of possession of a firearm during the commission of a felony carried a five-year mandatory minimum sentence, and it could not be deduced how the judge would have ruled had he appreciated the nonmandatory sentencing scheme. [396-397]

INDICTMENTS found and returned in the Superior Court Department on April 24, 2015. 

 The cases were tried before Christopher J. Muse, J. 

Christopher DeMayo for the defendant.

 Page 379 

 Julianne Campbell, Assistant District Attorney, for the Commonwealth.

 WALSH, J. A jury convicted the defendant, the former dean at The English High School in Boston (English High), of armed assault with intent to murder, and assault and battery by means of a dangerous weapon causing serious bodily injury (ABDW-SBI), in the shooting of an English High student. The defendant was also convicted of various other firearms offenses, namely carrying a firearm without a license, possession of ammunition without a firearm identification (FID) card, possession of a firearm while in commission of a felony, and possession of a firearm without an FID card (first and subsequent offenses), and of possession with intent to distribute a class D controlled substance. 

 At trial the defense to the shooting was identification. The defendant's primary argument on appeal is that the trial judge should have granted his motion for a mistrial because of the Commonwealth's late disclosure of a videotaped police interview with an important Commonwealth witness, an interview that he claims was material to the defense. The defendant also challenges numerous evidentiary rulings that he claims deprived him of a fair trial, as well as several aspects of the firearms convictions, and claims that the judge considered improper factors in sentencing and imposed a sentence for possession of a firearm while in commission of a felony that was based erroneously on a five-year mandatory minimum sentencing scheme. We discern no error, either individual or cumulative, giving rise to prejudice or a substantial risk of a miscarriage of justice and affirm the verdicts. Because the sentence imposed for possession of a firearm during the commission of a felony was premised on a mistaken belief that it was governed by a mandatory sentencing scheme, we vacate the sentences and remand the case for resentencing consistent with this opinion. 

 Background. We summarize the facts as they were presented to the jury, reserving certain details for later discussion. In January 2015, the defendant was hired as a dean at English High. He was responsible for mediating conflicts between students and teachers, supervising the student body, and running an anger management program for a small group of "at risk" students. Referred to familiarly by students and colleagues alike as "Rev," the defendant was hired to nurture and engender trust among an especially vulnerable population of adolescents. The victim, Luis Rodriguez, then sixteen or seventeen years old, was one such student who sought anger management counselling from the defendant. 

 Page 380 

 1. The shooting. On the evening of March 3, 2015, Rodriguez was shot in the back of the head while walking with another person along a desolate stretch of road in Boston. Rodriguez survived and managed to flag down a couple in a car, who called for emergency help. While he was being treated in the emergency department of a nearby hospital, Rodriguez identified "Rev" as the shooter to a Boston police detective.

 The next day, the English High headmaster told the defendant that Rodriguez had been shot but survived. The defendant became agitated and sat down clutching his chest, almost as if having a heart attack. Later that day, police officers went to English High to speak with the defendant. The defendant appeared to be "his normal self" when he asked an officer about Rodriguez's health and whether Rodriguez had spoken to the police. 

 The defendant accompanied officers to the police station, where he consented to a videotaped interview. The defendant was not under arrest at the time of the interview, but he was informed of his Miranda rights. He told the police that he arrived home around 4 p.m. on the day of the shooting, spent the evening playing games with two of his sons, and never left his apartment for any reason. Throughout the interview, the defendant maintained that he and Rodriguez had a good relationship, but that Rodriguez was "impulsive and out of control," prone to causing drama and lying, and frequently "used" the defendant and blamed him for any problems in order to avoid getting in trouble at English High. The defendant added that in his experience students were always trying to throw him "under the bus" to get themselves out of trouble. 

 The defendant denied having any in-person interactions with Rodriguez outside of English High. At one point, a detective casually inquired about a tattoo on the defendant's arm, which the defendant described as "the mojo sign" or a sort of motto ("keep it 100") that was displayed on the walls at English High. 

 When the detectives pressed the defendant on his whereabouts at the time of the shooting, the defendant reiterated that he did not contact Rodriguez and he did not leave his apartment. When told that Rodriguez said he and the defendant had spoken and met on the evening of the shooting, the defendant replied that he "[didn't] know" why Rodriguez would say that and "that never happened." The police eventually told the defendant that Rodriquez claimed that the defendant was with him at the time of the shooting and that video footage placed a person of the defendant's stature with 

 Page 381 

Rodriguez at the time of the shooting. The defendant calmly remarked, "That's not me," and promptly terminated the interview. The defendant was arrested shortly thereafter.

 2. Communication, surveillance, and physical evidence. The police seized the defendant's cell phone when he was arrested and subsequently extracted a series of text messages and call logs between the defendant and Rodriguez, dating back to early February 2015. Most of the text messages appeared to relate to selling drugs. In the last series of messages, exchanged on the day of the shooting, the defendant and Rodriguez agreed to meet at a McDonald's restaurant at 7 p.m. so that the defendant could give Rodriguez "molly and weed." 

 The police also obtained video footage from various security cameras located in the vicinity of the shooting. A compilation of the video footage (security footage) was shown to the jury. It depicted Rodriguez meeting with someone the jury could have found to be the defendant around 7:08 p.m. at a gasoline station near a McDonald's restaurant. The two walked together, Rodriguez in front of the defendant, in an isolated area up until the moment of the shooting, after which the defendant fled the scene. [Note 1] The security footage captured no other pedestrians near Rodriguez at the time of the shooting. Although the face of the shooter was obscured on the security footage, the jury could have fairly concluded that the person pictured in the video footage wearing gloves, a hooded sweatshirt with the hood pulled up, and a dark three-quarter length overcoat with a light-colored logo on the left chest was in fact the defendant. 

 The police also recovered photographs of drugs and firearms and a series of text messages sent from the defendant's phone after the shooting. Around 10:53 p.m. on the night of the shooting, the defendant sent two nearly identical text messages -- one to "Baby Girl" and another to "R-F" -- that said, "Pray for me," and were signed, "Running Fox." Around 8:51 A.M. on the morning after the shooting, the defendant sent two text messages to "R-F," providing Rodriguez's name and address. Around 4:02 p.m. that day, the defendant sent another text message to a recipient named "King D Block" that read, "Get out house." 

 Around the time that last text message was sent to "King D Block," a police officer observed three men leaving the defendant's 

 Page 382 

apartment building with backpacks. Concerned that they were removing evidence -- namely, the weapon used in the shooting -- from the defendant's apartment, the officer stopped them and pat frisked all three individuals. The officer recovered two handguns, multiple clear bags containing marijuana, $2,078 in cash, and four cell phones. One of the cell phones had the same number as the "King D Block" contact in the defendant's cell phone.

 On March 6, 2015, the police executed a search warrant at the defendant's apartment building for his apartment and basement storage unit. From the defendant's bedroom closet, the police recovered two firearms -- a twelve-gauge shotgun and a rifle -- as well as multiple twelve-gauge shotgun shells and a loaded magazine clip for a handgun. The police found other live and spent ammunition [Note 2] elsewhere in the apartment. In the defendant's storage unit, there was ammunition hidden in the ceiling, and bags of marijuana were hidden in a laundry bag. In a locked safe in the storage unit, there was additional ammunition, a bag of cocaine, and a plastic Goodwill shopping bag containing a loaded handgun and a nonfunctional handgun. The sole fingerprint recovered from the Goodwill bag belonged to the defendant. 

 Prior to the shooting, the defendant's neighbor had noticed certain objects in her storage unit (which was adjacent to the defendant's) that did not belong to her. She consented to a search of her unit, which was locked with a padlock the defendant had given to her (and which still had the combination noted on the back). From that unit, the police recovered a black three-quarter length jacket with a white logo on the left chest and a navy-blue hooded sweatshirt. The black jacket resembled the one worn by the shooter on the security footage, and its sleeve cuffs tested positive for gunshot residue. A deoxyribonucleic acid (DNA) swab of the jacket showed "a mixture of at least four or more individuals." A pair of gloves taken from the defendant when he was booked at the police station also resembled those worn by the shooter on the security footage and tested positive for gunshot residue. The police obtained additional security camera video footage from a Massachusetts Bay Transit Authority station where the defendant's "Charlie" card had been used earlier on the day of the shooting (MBTA footage). The MBTA footage showed

 Page 383 

 the individual using the defendant's Charlie card wearing a jacket "very similar to" the one found in the neighbor's storage unit. 

 The police never recovered the firearm used in the shooting, but one spent .38 caliber ammunition cartridge was found in a snow pile next to where Rodriguez was shot. A .38 caliber bullet fragment was removed from Rodriguez's cheekbone in the hospital. 

 3. Testimonial evidence. At trial, Rodriguez testified that the defendant recruited him to sell marijuana. From early February 2015 until the day of the shooting, Rodriguez and the defendant communicated regularly by cell phone and text message regarding Rodriguez's personal life and drug sales. Rodriguez testified that, shortly before the shooting, the defendant told him someone had stolen drugs from his office. Rodriguez had considered his relationship with the defendant to be fine until that moment, when he believed the defendant was accusing him of the theft. 

 Other former English High students, Kevin Perez, Ledi Arias, and Jose Nova testified that the defendant also had attempted to recruit them to sell drugs. The students stated that the defendant was upset with Rodriguez and feared Rodriguez was going to "tell on him." The defendant told the students that "[s]omething need[ed] to be done," and ultimately asked them to fight (or "handle") Rodriguez. Arias testified that he agreed to fight Rodriguez because the defendant promised to give him marijuana in return. 

 On the day of the shooting, Arias did, in fact, fight Rodriguez in a bathroom at English High. The defendant was present in the bathroom but did not break up the fight, which contravened his professional obligation to immediately intervene in fights between students. 

 Rodriguez testified that he met with the defendant later that day at a gasoline station across the street from a McDonald's restaurant. He stated that the defendant was the only person with him before he was shot and identified the defendant as the person depicted on still photographs generated from the security footage. 

 Discussion. 1. Delayed disclosure of the videotaped police interview. On the fifth day of trial, after Perez concluded his testimony, the Commonwealth stated that it had just obtained a previously undisclosed videotape of an interview with Perez during which police officers engaged in arguably coercive tactics to entice Perez to state that the defendant recruited him to sell drugs and that the defendant planned to retaliate against Rodriguez. After reviewing the videotape, defense counsel moved for 

 Page 384 

a mistrial on the grounds that the late disclosure hindered his ability to effectively cross-examine Perez and precluded counsel from using the information provided by Perez to investigate other potential witnesses and to impeach the Commonwealth's witnesses. The Commonwealth does not dispute that the videotape was exculpatory in nature, given the importance of Perez's testimony in corroborating the testimony of Rodriguez and the other students, and that the Commonwealth failed -- though not intentionally -- to meet its constitutional obligation to include it in pretrial discovery. [Note 3] Mass. R. Crim. P. 14 (a) (1) (A) (iii), as amended, 444 Mass. 1501 (2005). See Brady v. Maryland, 373 U.S. 83, 87-88 (1963); Commonwealth v. Bockman, 442 Mass. 757, 766 (2004).

 The judge considered a number of options to mitigate the effect of the delayed disclosure, including (i) granting a continuance of approximately three business days for defense counsel to review the videotape and reassess his strategy, including whether he would need to hire an expert on false confessions or whether a further continuance would be necessary; (ii) allowing defense counsel to recall Perez for further cross-examination; (iii) permitting defense counsel to question the detectives who interviewed Perez; (iv) playing for the jury only the portions of the videotape where "the [d]etectives [we]re allegedly berating [Perez] to tell the story" that was consistent with his trial testimony; (v) striking Perez's testimony entirely; (vi) striking Nova's testimony that the defendant said "something has to be done [about Rodriguez]"; and (vii) granting a mistrial. After careful consideration and lengthy discussions with the parties, the judge ultimately denied the motion for a mistrial. He noted that "these things happen in the processes of trials all the time," and absent any showing of "deliberate withholding" of evidence, he believed various remedial measures could adequately offset potential prejudice. To that end, the judge ordered the Commonwealth to make available to defense counsel for questioning "every single officer associated with that interview," to keep Perez available should defense counsel choose to recall him, and to provide defense

 Page 385 

counsel with an expedited transcript of the interview to assist in his review. Lastly, the judge asked defense counsel to tell him what, if any, additional remedial measures he would like the judge to take. Defense counsel did not request further remedial measures. 

 The judge's determination that the remedial actions taken were "adequate means to correct any error and to remedy any prejudice to the defendant" will not be disturbed absent an abuse of discretion. Commonwealth v. Amirault, 404 Mass. 221, 223 (1989). The key question before the judge was, in light of all the evidence, "whether, given a timely disclosure, [the defendant] would have been able to prepare and present [his] case in such a manner as to create a reasonable doubt that would not otherwise have existed." Commonwealth v. Wilson, 381 Mass. 90, 114 (1980). 

 The Commonwealth's case, although undoubtedly bolstered by the testimony of Perez and the other students, primarily consisted of Rodriguez's testimony and corroborating physical evidence. Indeed, the judge noted that the videotape could most effectively be used to impeach Perez (and the other students) through inconsistent statements and perceived police coercion and, by extension, cast doubt on the integrity of the investigation. Defense counsel already had deployed many of these lines of attack in his thorough cross-examination of the witnesses before the videotape was uncovered, and he continued to do so throughout trial. For example, defense counsel called into question the accuracy of the memories of Rodriguez, Arias, Perez, and Nova and highlighted multiple inconsistencies in their statements to police and their testimony at trial. He challenged the diligence of the police investigation, primarily their collection of evidence. He also elicited significant admissions from the Commonwealth's experts, for instance, that it was impossible to tell when the defendant's fingerprint was placed on the Goodwill bag containing firearms and ammunition, tests could not determine what kind of firearm or when such firearm left the gunshot residue on the black jacket found in the neighbor's storage unit, no blood was found on the defendant's gloves or the black jacket taken from the storage unit, and the black jacket had DNA from at least four individuals on it (strongly suggesting someone other than the defendant could have worn it during the shooting). In view of the entire record and the remedial measures offered by the judge, we are not persuaded that, even if there had been timely disclosure, defense counsel would have been able to use the videotape of

 Page 386 

 Perez's interview "to create a reasonable doubt that would not otherwise have existed." Wilson, 381 Mass. at 114. See Commonwealth v. Baldwin, 385 Mass. 165, 177 (1982) (continuance typically would be adequate where undisclosed evidence is not "strongly supportive of innocence"). Cf. Commonwealth v. Holbrook, 482 Mass. 596, 610 (2019) (remanding for evidentiary hearing where undisclosed e-mails between murder victim and witness could have been used to impeach witness's credibility and defense had "no other means" of doing so). 

 Moreover, defense counsel had the option to request a further continuance, among many other proffered remedies, including recalling Perez, which counsel expressly declined to do. It is unclear whether his failure to request additional remedial measures was a purposeful tactical decision. See Commonwealth v. St. Germain, 381 Mass. 256, 263-264 & n.11 (1980). Whatever the reason for defense counsel's decision, there is no hint that the judge "made 'a clear error of judgment in weighing'" the consequences of the delayed disclosure and fashioning appropriate remedial measures to permit defense counsel additional time and resources to investigate and counter the testimonial evidence against the defendant. L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014), quoting Picciotto v. Continental Cas. Co., 512 F.3d 9, 15 (1st Cir. 2008). See Wilson, 381 Mass. at 115 (consequences of delayed disclosure mitigated "by the judge's rulings extending to the defendants the opportunity to recall [witnesses] . . . for further cross-examination and to seek any continuances necess[ary]"). 

 2. Evidentiary rulings. We review the judge's evidentiary rulings for an abuse of discretion. See Commonwealth v. Bonds, 445 Mass. 821, 831 (2006). Any preserved error is reviewed for prejudice to determine "whether 'there is a reasonable possibility that the error might have contributed to the jury's verdict.'" Commonwealth v. Wardsworth, 482 Mass. 454, 458 (2019), quoting Commonwealth v. Sullivan, 478 Mass. 369, 376 (2017). An error is prejudicial if "one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error [and] it is impossible to conclude that substantial rights were not affected" (citation omitted). Commonwealth v. Peruzzi, 15 Mass. App. Ct. 437, 445 (1983). We review any unpreserved error to determine whether it created a substantial risk of a miscarriage of justice, that is, whether it "materially 

 Page 387 

influence[d]" the jury such that the verdict "might have been otherwise but for the error" (citations omitted). Commonwealth v. Alphas, 430 Mass. 8, 13 (1999). 

 a. Police interview with the defendant. The videotape of the defendant's police interview was presented to the jury. For the first time on appeal, the defendant argues that the videotape should have been excluded because the interview consisted either of inadmissible accusations and unequivocal denials of criminal activity, or other information that was largely irrelevant and prejudicial. We address each unpreserved challenge in turn.

 i. Denials. The defendant claims that the judge erred in admitting the portion of the videotaped interview where he denied being with Rodriguez the evening of the shooting and, in response to being told that videotaped footage showed a person resembling the defendant in the area of the shooting, denied that it was him. 

 Even accepting, arguendo, that some of the exchanges in question would qualify as a denial, the defendant's argument fails because the denials were made prior to his arrest. See Commonwealth v. Mejia, 463 Mass. 243, 251 (2012), quoting Commonwealth v. Waite, 422 Mass. 792, 801 (1996) (declining to "extend to statements made during noncustodial, prearrest police questioning . . . our 'long-standing rule' prohibiting the use at trial of a defendant's postarrest denials where the defendant chooses not to testify"). Moreover, considering the strength of the Commonwealth's case in its entirety, admission of the defendant's voluntary prearrest statements to the police regarding his relationship with Rodriguez and the defendant's whereabouts on the night of the shooting (most of which were in his interest) did not create a substantial risk of a miscarriage of justice. See Alphas, 430 Mass. at 13. [Note 4] 

 ii. The defendant's tattoo. Assuming, without deciding, that evidence of the defendant's tattoo was not relevant to any issue in the case, we nevertheless discern no basis for concluding, as the

 Page 388 

 defendant argues, that the discussion pertaining to the tattoo was introduced to show the defendant's affiliation with a gang, thereby causing prejudicial harm. First, the Commonwealth was prohibited explicitly from introducing evidence of gang affiliation. Throughout the trial, the parties meticulously avoided eliciting any such testimony. Second, the defendant provided a perfectly benign explanation for the tattoo in his interview. Third, the tattoo was never again referenced at trial. Accordingly, and in consideration of the Commonwealth's case as a whole, the passing mention of defendant's tattoo did not "materially influence[]" the verdict such that it created a substantial risk of a miscarriage of justice. Alphas, 430 Mass at 13. See Commonwealth v. Lewis, 465 Mass. 119, 127 (2013).

 iii. Alibi. The defendant did not call either of his sons as witnesses to corroborate his statements in the videotaped interview that he stayed at home with them on the night of the shooting. He argues that it was error to admit these statements because they were irrelevant, and the jury undoubtedly drew a negative inference from his failure to provide an alibi. We disagree. Evidence of the defendant's whereabouts and his companions on the night of the shooting undoubtedly was probative regarding whether he was with Rodriguez at the time of the shooting. See Mass. G. Evid. § 401(a) (2021). Furthermore, his statements were properly admissible as those of a party opponent. See Mass. G. Evid. § 801(d)(2) (2021); Spencer, 465 Mass. 32, 46 (2013). 

 Even accepting, arguendo, that it was error to admit these statements, there was no substantial risk of a miscarriage of justice. As the defendant acknowledges, he was under no obligation to present evidence and therefore well within his right to make the tactical decision not to call witnesses. See Commonwealth v. Franklin, 366 Mass. 284, 294 (1974). The judge emphasized this point to the jury, instructing them that "the law never imposes on a defendant in a criminal case the burden or duty of calling any witness or . . . presenting any evidence whatsoever." He added that the jury should "rely on the presumption of innocence and . . . require the Commonwealth to prove its case [beyond a reasonable doubt]." We presume the jury followed these instructions. See Bonds, 445 Mass. at 835, and cases cited. There was no substantial risk of a miscarriage of justice. 

 b. Video recording of Rodriguez in the hospital. Rodriguez's aunt made a short cell phone video recording of Rodriguez in the

 Page 389 

 hospital, in which he said that the "guy giving [him] the weed" was named "Rev," and that "Rev" had stolen Rodriguez's cell phone. Rodriguez also complained that his jaw hurt, said it was unfair that he was shot, and exclaimed, "What the fuck did I do to the world to deserve this." The defendant argues now, as he did at trial, that the video recording should not have been admitted as an out-of-court identification, Mass. G. Evid. § 801(d)(1)(C) (2021), because Rodriguez neither used the defendant's name nor saw the defendant shoot him, and that the video recording was prejudicial because it provoked sympathy for Rodriguez. 

 A prior statement that "identifies a person as someone the declarant perceived earlier" is admissible so long as "[t]he declarant testifies and is subject to cross-examination about [that] prior statement." Mass. G. Evid. § 801(d)(1)(C). The defendant urges us to adopt an extremely restricted interpretation of the term "perceived," namely, that Rodriguez could only have perceived the defendant to be the shooter if Rodriguez had seen the defendant pull the trigger, an impossibility because of the fact that Rodriguez was shot in the head from behind. The ordinary meaning of "perceived," a term commonly understood to refer to any of the five human senses, belies such a restrictive interpretation. See Webster's Third New International Dictionary 1675 (3d ed. 1981) (defining "perceive" as "to become aware of through the senses"). 

 Moreover, Rodriguez testified, and was subject to cross-examination, that (i) he met the defendant on the night of the shooting, in part because the defendant promised to give him "molly and weed," (ii) the defendant was the only person with Rodriguez in an isolated area at the time of the shooting, (iii) Rodriguez knew that the defendant was walking directly behind him because Rodriguez heard the defendant talking on Rodriguez's phone immediately before he was shot in the back of the head and fell to the ground, and (iv) when Rodriguez got up, the defendant was nowhere in sight. Rodriguez was able to perceive the defendant to be the shooter by earlier visual contact, hearing the defendant speaking behind him, and later seeing that he had fled the scene. We discern no abuse of discretion in admitting Rodriguez's statements that "Rev" was the man who gave him "the weed" and "stole [his] phone, too," as they clearly placed the defendant at the scene of the shooting. The admission of the video recording was probative of the identification of the shooter, and while the defendant claims that the video recording provoked sympathy for 

 Page 390 

Rodriguez, the jury were able to evaluate and physically observe Rodriguez when he testified at trial, including the physical scars from the shooting. The probative value was not substantially outweighed by the prejudice. 

 c. Rodriguez's "excited utterance" in the hospital. Within about thirty minutes of the shooting, a Boston police detective spoke with Rodriguez at the hospital. According to the detective, Rodriguez appeared to be in pain, was bleeding heavily, and asked multiple people whether he was going to die. When the detective asked what had happened, Rodriguez replied "that he didn't know why the Rev did this to him." A short while later, after Rodriguez had undergone some emergency tests, Rodriguez stated again that "Rev" shot him. The defendant argues, as he did at trial, that Rodriguez's statements were not admissible under the excited utterance exception to the rule against hearsay.

 The key question for the judge "[wa]s whether the statement[s] [were] made under the stress of an 'exciting event and before the declarant . . . had time to contrive or fabricate the remark[s], and thus . . . ha[d] sufficient indicia of reliability.'" Wilson, 94 Mass. App. Ct. at 421, quoting Commonwealth v. Baldwin, 476 Mass. 1041, 1042 (2017). Some nonexhaustive factors that bear on admissibility include whether the statements were made in the same place as the exciting event, how much time had elapsed, and the declarant's "age, spontaneity, and degree of excitement." Wilson, supra. Here, the statements were made within a relatively short time after a near-death experience. Rodriguez was bleeding heavily from his head in the emergency department of a hospital, and even though he appeared dazed, asked multiple people, including the detective, if he was going to die. 

 It was reasonable for the judge to conclude that a young person, in considerable pain and receiving emergency treatment for a gunshot to the back of the head -- an injury most would understand to be life threatening -- would not have had sufficient time and presence of mind to reflect and fabricate a story that his school counsellor was the culprit. [Note 5] See Wilson, 94 Mass. App. Ct. at 422 (noting "the existence of a medical emergency may contribute to a finding that the declarant was under the stress of an exciting event"). Accord Commonwealth v. Marshall, 434 Mass. 358, 364-365 (2001) (adult victim's statements made two hours 

 Page 391 

after defendant held knife to her throat admissible where victim was "in a highly agitated state"). Further, the defendant had ample opportunity to confront Rodriguez through cross-examination. The judge did not abuse his discretion in admitting the statements. 

 d. Expert testimony. The defendant moved in limine to exclude, broadly, "any and all expert testimony." At the motion hearing held before trial, defense counsel clarified that he sought only to exclude testimony from the doctor who treated Rodriguez, especially as it pertained to the bullet's potential trajectory. Defense counsel argued that the Commonwealth had not informed him of the witness until just a few days earlier, and that the testimony would be impermissible speculation about injuries Rodriguez could have sustained but did not. At the hearing, the judge denied the motion, in part, because of the fact that "notice of this doctor was given in 2016," and that the doctor would be subject to cross-examination. The judge added that the doctor, "as a treating physician[,] . . . could speak about the wounds that he observed and he can testify to anything he wants without any restriction as a general matter. . . . [H]e certainly has a right as a doctor to be able to say that if [the bullet] hit the carotid artery that it would cause something," or "if there was a spinal injury it could have resulted in paralysis." Notwithstanding this discussion, the defendant's motion in the record contains a handwritten margin endorsement showing that it was "Allowed." At trial, defense counsel objected specifically to the doctor's testimony that Rodriguez likely would have died or been paralyzed had the bullet followed a slightly different trajectory and severed Rodriguez's carotid artery or brain stem. On appeal the defendant contends that the doctor's testimony was admitted in error because (i) his motion to exclude the testimony was endorsed "Allowed," and (ii) the testimony was irrelevant and prejudicial.

 Given the judge's discussion with the parties at the motion hearing, it is manifest that the "allowance" of the defendant's motion was a scrivener's error. See Charara v. Yatim, 78 Mass. App. Ct. 325, 338 (2010) (judgment on child support amount was "a scrivener's error" because judge's findings made it clear he intended different amount). The judge deemed the testimony permissible as it pertained to the doctor's assessment and treatment of Rodriguez. Although, as the defendant argues, the testimony may not have been crucial to prove intent to murder -- as most lay people would understand a shot to the head was intended

 Page 392 

 to be fatal -- we will not overturn the judge's ruling based on "a debatable question of admissibility." Spencer, 465 Mass. at 48, quoting Commonwealth v. Bys, 370 Mass. 350, 360-361 (1976). See L.L., 470 Mass. at 185 n.27 (no abuse of discretion unless "decision falls outside the range of reasonable alternatives").

 Even accepting, arguendo, that testimony regarding the possible trajectory of the bullet should have been excluded, defense counsel's cross-examination of the doctor effectively nullified any prejudice because the doctor acknowledged that the injury Rodriguez sustained was not life threatening. Cf. Wardsworth, 482 Mass. at 470-471 (error prejudicial where improperly admitted evidence of gang affiliation went to heart of Commonwealth's case and could have suggested to jury that defendant had criminal or violent propensities). Given this acknowledgement, and the strength of other evidence against the defendant, we believe that the challenged statements "had but a slight effect on the jury[, if any]." Id. at 471. 

 e. Trap music. Rodriguez testified that he visited the defendant's apartment on at least one occasion before the shooting, and there they listened to "trap," or "gang banging," music. When Rodriguez explained to the defendant that one particular song was about guns, the defendant responded by showing him a .38 caliber handgun that the defendant had in his apartment. The defendant now argues for the first time on appeal that this testimony should have been excluded as irrelevant and unduly prejudicial. 

 Rodriguez's testimony regarding the music and gun references therein tended "to make a fact more . . . probable," that is, that the defendant voluntarily showed Rodriguez his own firearm to relate to Rodriguez. Mass. G. Evid. § 401(a). Most significantly, Rodriguez's description of the firearm -- a .38 caliber handgun with a "red dot on the back" for aiming -- was relevant because it did not match any of the firearms found in the defendant's apartment, which would support the inference that it was the weapon used in the shooting. See Mass. G. Evid. § 401(a). Further, this testimony demonstrated Rodriguez's music preferences at the time, not the defendant's; we find nothing in the record to support the defendant's argument that the testimony was admitted to suggest the defendant had violent tendencies because he listened to music with references to violence. There was no error. 

 f. Prior accusation of selling drugs. On the day after the shooting, police officers went to English High to locate the defendant.

 Page 393 

 When one officer found him outside the cafeteria, the defendant volunteered that at a previous school where he used to work, a student accused him of selling drugs, but the school's administration determined that the accusations were unfounded. The defendant argues for the first time on appeal that this remark was inadmissible as "prior bad acts" evidence. 

 The evidence was admissible as a statement of a party-opponent. See Mass. G. Evid. § 801(d)(2); Spencer, 465 Mass. at 46. The defendant claims that the statement, even if made by the defendant, was irrelevant and highly prejudicial. The determination whether to admit prior bad act evidence is "committed to the sound discretion of the trial judge and will not be disturbed by a reviewing court absent 'palpable error.'" Commonwealth v. McCowen, 458 Mass. 461, 478 (2010), quoting Commonwealth v. Fordham, 417 Mass. 10, 23 (1994). The defendant offered this information unprompted to the police the day after the shooting while he was outside the cafeteria. Moreover, it is reasonable to infer that the defendant was attempting to deflect suspicion of his involvement in the crime by preemptively discrediting any students, including Rodriguez, who the defendant anticipated would say he recruited to sell drugs. Because the probative value outweighs the prejudice, there was no error in the admission of the statement. 

 3. Firearms charges. a. Duplicative charges. The defendant argues that his convictions of carrying a firearm without a license and unlawful possession of ammunition violate principles of double jeopardy because they are lesser included offenses, and therefore duplicative, of his conviction of ABDW-SBI. Because the offenses of carrying a firearm without a license and unlawful possession of ammunition each require proof of an additional element not required to prove ABDW-SBI, this argument fails. 

 "[W]e adhere to the elements-based approach" to determine whether convictions are duplicative. Commonwealth v. Anderson, 461 Mass. 616, 634, cert. denied, 568 U.S. 946 (2012). "As long as each offense requires proof of an additional element that the other does not," the crimes are not lesser included offenses and therefore not duplicative. Commonwealth v. Vick, 454 Mass. 418, 431 (2009). See Morey v. Commonwealth, 108 Mass. 433, 434 (1871) (charges are duplicative where evidence needed to convict on one charge would suffice to convict on other charge). See also Whalen v. United States, 445 U.S. 684, 693-694 (1980) (charges duplicative where "[a] conviction for killing in the course of a

 Page 394 

 rape cannot be had without proving all the elements of the offense of rape"). 

 To prove the offense of ABDW-SBI, the Commonwealth was required to show (i) the defendant touched Rodriguez without a right to do so, (ii) intentionally, (iii) with a dangerous weapon, and (iv) the touching caused Rodriguez serious bodily injury. See G. L. c. 265, § 15A (c) (i). To prove the offense of carrying a firearm without a license, the Commonwealth was required to show (i) the defendant possessed an item (ii) that met the legal definition of a "firearm," and (iii) the defendant knew he possessed said item. See G. L. c. 269, § 10 (a). To prove the offense of unlawful possession of ammunition, the Commonwealth was required to show (i) the defendant possessed an item (ii) that met the legal definition of "ammunition," and (iii) the defendant knew he possessed said item. See G. L. c. 269, § 10 (h). The judge instructed the jury that "as a matter of law, . . . a firearm is a dangerous weapon." The defendant now suggests that because the Commonwealth's theory on the ABDW-SBI offense relied on evidence that he used a loaded .38 caliber firearm to shoot Rodriguez, then the aforementioned firearm and ammunition offenses necessarily are duplicative of ABDW-SBI because possession of the same firearm and ammunition formed the bases for his convictions on those two charges. 

 The offense of ABDW-SBI does not define "dangerous weapon," G. L. c. 265, § 15A (c) (i), and the term has been interpreted broadly to include items that are "dangerous per se" (e.g., firearms) or "dangerous as used" (e.g., hammers, razors). Commonwealth v. Appleby, 380 Mass. 296, 303, 307 (1980). In fact, "the specification of the particular weapon used in the ABDW-SBI is superfluous." Commonwealth v. Brule, 98 Mass. App. Ct. 89, 95 (2020). For that matter, the Commonwealth was not required to prove discharge of the firearm, as it would be for assault and battery by discharging a firearm. See G. L. c. 265, § 15E. 

 That firing a loaded .38 caliber firearm was the factual basis for the ABDW-SBI charge does not make it an element of the crime, but one of a potentially infinite number of "similar, equivalent types of conduct any one (or more) of which will suffice to prove a single element." Commonwealth v. Roderiques, 462 Mass. 415, 421 (2012), quoting Commonwealth v. Santos, 440 Mass. 281, 289 (2003). See Appleby, 380 Mass. at 303-305. The Commonwealth was not required to prove knowing possession of a dangerous 

 Page 395 

weapon, or that the dangerous weapon used met the legal definitions of either "firearm" or "ammunition" to convict the defendant of ABDW-SBI. See Brule, 98 Mass. App. Ct. at 95. The challenged firearm and ammunition offenses, therefore, are not duplicative. See Vick, 454 Mass. at 431, quoting Commonwealth v. Cabrera, 449 Mass. 825, 827 (2007) (courts analyze "only the elements of the crimes, not the facts to be proved or the evidence adduced to prove them"). 

 b. Affirmative defenses. During the defendant's prearrest interview with the police, he admitted to possessing a rifle and a shotgun that he claimed had belonged to his parents. The defendant acknowledged that he had an FID card but it had expired. At trial, a detective verified that the defendant had, in fact, once held a valid FID card and that it expired. The defendant now contends that because he once held an FID card to possess the rifle and shotgun found in his apartment, he should have been subject only to civil penalties under G. L. c. 140, § 129B (12), for the charges predicated on possession of those two firearms and corresponding ammunition.

 General Laws c. 140, § 129B (12), provides in pertinent part that "any person in possession of a non-large capacity rifle or shotgun whose firearm identification card . . . is invalid for the sole reason that it has expired . . . shall be subject to a civil fine . . . [and G. L. c. 269, § 10] shall not apply." The defendant's argument fails for the simple reason that to avail himself of an affirmative defense under § 129B, he had the burden to produce at least some evidence that "the sole reason" he did not have a valid FID card was because it had been allowed to lapse. [Note 6] See Commonwealth v. Farley, 64 Mass. App. Ct. 854, 860-863 (2005) (considering analogous affirmative defense under G. L. c. 140, § 131 [m], license to carry firearm). 

 Assuming, arguendo, that the brief mention of the defendant's once-valid FID card was sufficient to raise the issue now argued on appeal, he failed to produce any evidence that the "sole reason" he lacked an FID card was because he had not renewed it. Cf. Farley, 64 Mass. App. Ct. at 862-863 (defendant presented proof of approval for FID card and showed he had neither applied for nor been denied license to carry). The burden did not shift to the Commonwealth to produce any additional evidence to disprove 

 Page 396 

an affirmative defense under G. L. c. 140, § 129B (12). Cf. Farley, supra. There was no error. 

 c. Sufficiency of the evidence on count 8, possession of a firearm without an FID card. At trial, a ballistics expert testified about his examination of the various firearms and ammunition recovered from the defendant's apartment and storage unit. As a preliminary matter, the expert detailed his methodology for examining firearms, which involved recording certain measurements and other identifying information, as well as a general functionality test. The expert said that after he determined a firearm was "safe to test fire, [and] appears to be in good working condition" he would "attempt to test-fire it." Although the expert explicitly confirmed that he successfully test-fired the rifle underlying one of the other unlawful possession charges, he failed to testify at trial that he had, in fact, test-fired the twelve-gauge shotgun underlying count 8. The expert did, however, testify without objection that the twelve-gauge shotgun was "a shotgun according to Mass. General Laws." Because a firearm must be operable in order to satisfy the legal definition under G. L. c. 140, § 121, the defendant now contends that the expert's testimony was insufficient to support the conviction, because he did not explicitly say he test-fired the shotgun. 

 To prove operability, the Commonwealth needed only to "present some competent evidence" to permit the jury to reasonably infer that the shotgun would fire. Commonwealth v. Nieves, 43 Mass. App. Ct. 1, 2 (1997). Here, the jury were told that the expert's examination of a firearm invariably entailed a safety check and test-firing, provided the firearm appeared safe to use. The expert averred that he examined the shotgun, and based on that examination, he concluded that it met the legal definition of a firearm. A jury could reasonably infer that, because the expert's firearm examination process entailed test-firing to assess functionality, the expert concluded that the shotgun met the legal definition of a firearm only because it successfully test-fired. In viewing all the evidence and permissible inferences in the light most favorable to the Commonwealth, we believe this qualifies as "some competent evidence," id., sufficient to permit "any rational trier of fact . . . [to find] the essential elements of [count 8] beyond a reasonable doubt." Commonwealth v. Latimore, 378 Mass. 671, 677 (1979), quoting Jackson v. Virginia, 443 U.S. 307, 318-319 (1979). 

 4. Resentencing. At the sentencing hearing, the judge stated that the defendant's conviction of possession of a firearm during

 Page 397 

 the commission of a felony carried a five-year mandatory minimum sentence. See G. L. c. 265, § 18B ("Whoever [possesses a firearm during the commission of a felony] . . . shall, in addition to the penalty for such offense, be punished by imprisonment in the state prison for not less than five years"). This was an error, as the Supreme Judicial Court has clarified that § 18B does not impose a mandatory minimum sentence. [Note 7] See Commonwealth v. Hines, 449 Mass. 183, 191 (2007) (remanding for resentencing because "[t]he absence of the word 'mandatory' in the relevant language . . . of § 18B . . . leads us to reject the Commonwealth's contention that the statute requires a mandatory minimum State prison sentence of five years"). See also Commonwealth v. Thomas, 484 Mass. 1024, 1026 n.8 (2020) ("A judge, for instance, may sentence a defendant to not less than two years and not more than five years; the maximum sentence, however, must be no less than five years"). 

 "[J]udges are permitted great latitude in sentencing" within statutory and constitutional bounds. Commonwealth v. McIntyre, 436 Mass. 829, 833 (2002), quoting Commonwealth v. Power, 420 Mass. 410, 413-414 (1995), cert. denied, 516 U.S. 1042 (1996). Although the judge intended to impose a sentence within permissible bounds, we cannot deduce how the judge would have ruled had he appreciated the nonmandatory sentencing scheme, and we cannot affirm a sentence where it is premised upon a misapprehension of the law. See Hines, 449 Mass. at 191, citing Commonwealth v. Lightfoot, 391 Mass. 718, 718-719 n.1 (1984) (where statute imposes nonmandatory minimum term judges retain "discretion in sentencing"). We therefore vacate the sentence on the defendant's conviction of possession of a firearm while in commission of a felony. Because the mistaken belief that the defendant was subject to a mandatory minimum sentence "may have played a part in the judge's over-all concept in sentencing," we must allow the Superior Court [Note 8] an opportunity to restructure the defendant's sentences. Commonwealth v. Talbot, 444 Mass. 586, 597-598 (2005). Accordingly, we vacate the defendant's remaining sentences and remand the case for resentencing. [Note 9] 

 Conclusion. For the reasons set forth above, the verdicts are affirmed. The sentences are vacated, and the case is remanded for resentencing consistent with this opinion. 

 So ordered.

FOOTNOTES
[Note 1] The shooter's flight path passed directly in front of the defendant's apartment building, but the shooter was not seen entering the apartment building. 

[Note 2] Several of the caches of ammunition in the apartment and storage unit contained .38 caliber ammunition, the same caliber as the bullet fragment extracted from Rodriguez's cheekbone. 

[Note 3] Based on Perez's testimony before the grand jury, the minutes of which were provided to defense counsel, it was evident that Perez had been interviewed by the police. After the trial had begun, defense counsel asked for any reports that were generated after that interview. The Commonwealth apparently first learned of the videotape after contacting the police to inquire about the reports requested by defense counsel. 

[Note 4] The detective did not say that the defendant was, in fact, the person pictured in the footage. Cf. Commonwealth v. Suarez, 95 Mass. App. Ct. 562, 570 (2019) (error to admit detective's opinion "that the defendant was the man in the videotape" where jury could reach "their own conclusions" without detective's help). Even if the jury interpreted the detective's question as an identification, it was cumulative of other evidence that the defendant was the person in the footage -- namely, the black jacket the defendant wore in the MBTA footage, the text messages arranging the meeting on the night of the shooting, and Rodriquez's testimony that it was the defendant in the security footage. 

[Note 5] Under these circumstances, the admissibility of Rodriguez's statements is not undercut merely because they were made in response to the detective's questions. See Commonwealth v. Hardy, 47 Mass. App. Ct. 679, 685 (1999). 

[Note 6] This exemption from criminal penalty is not available, for instance, if the lack of a valid FID card is because of revocation or suspension (active or pending), or denial of a renewal application. G. L. c. 140, § 129B (12). 

[Note 7] Judges retain discretion to reduce or suspend a sentence under G. L. c. 265, § 18B, unless the conviction is "for a second or subsequent offense." 

[Note 8] We note that the trial judge has retired. 

[Note 9] Because the case is remanded for resentencing, we need not reach the defendant's argument regarding the propriety of the judge's sentencing considerations. 

 
 Home/Search 
 Table of Cases by Citation
 Table of Cases by Name 
 

 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.